**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMY L. FOX,<br><br>Plaintiff,<br><br>v.<br><br>WEALTH ENHANCEMENT GROUP, LLC,<br><br>Defendant. | ) | Civil Action No. 25-281 |

# MEMORANDUM OPINION

## I. INTRODUCTION

This civil action arises from Plaintiff Amy L. Fox's ("Plaintiff" or "Fox") employment and subsequent termination from Defendant Wealth Enhancement Management Group, LLC, ("Defendant" or "WEG"). In her Amended Complaint, Plaintiff includes claims for sex/pregnancy discrimination (Count I) and retaliation (Count II) in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), as well as for discrimination and retaliation (Count V) in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). (Docket No. 30). Defendant has moved for summary judgment on all remaining claims[1] under Federal Rule of Civil Procedure 56. (Docket Nos. 36; 39). The motion has been fully briefed and is now ripe for disposition. (Docket Nos. 37; 38; 43; 48; 50; 52; 70; 72; 75; 85; 90; 97).

Having considered the parties' positions, and for the following reasons, Defendant's Motion for Summary Judgment [36] will be granted in its entirety.

[1] *See* § III at 10, *infra* (discussing the parties' stipulated dismissal of Plaintiff's retaliation claims under the Pregnant Workers Fairness Act and Family Medical Leave Act at Counts III and IV of her Amended Complaint on January 14, 2026).

## II. BACKGROUND

The following facts are taken from the parties' Concise Statements of Material Facts and responses. (Docket Nos. 37; 70; 72; 75; 85). Unless otherwise indicated, the below facts are undisputed.

WEG is a full-service wealth management firm based in Minnesota which serves a broad range of clients consisting of both individuals and businesses.[2] (Docket No. 75 ¶ 1). WEG expands its client base by acquiring other financial services firms across the country. (*Id.* ¶ 2). Once an acquisition is completed, WEG's Transition Support Team is responsible for moving client financial accounts from newly acquired firms into the WEG framework. (*Id.* ¶ 3). On July 1, 2022, WEG hired Fox as a client services associate on the Transition Support Team. (*Id.* ¶ 6). This was a remote position and she worked from her home in Washington, Pennsylvania. (Docket No. 47-1). The position was non-exempt, required her to work 40 hours a week, and provided opportunities for annual merit increases and a corporate annual bonus. (*Id.*). In this role, Fox helped newly acquired "Advisor Teams" transition their existing client accounts and business, which entailed completing client paperwork, setting up accounts, and recording the progress of the transition in an account tracking spreadsheet. (*Id.* ¶¶ 7, 9).

At some point in April 2023, Nicole Parsons ("Parsons") became Fox's supervisor on the Transition Support Team.[3] (*Id.* ¶ 11). Parsons testified that, upon assuming this role, her direct reports included the existing team members—i.e., Anna Wolbrock, Laura Sokolowski, Michelle Greve, and Fox—as well as the former team manager she replaced, Sheyna Regets. (Docket No.

---

[2] At oral argument, defense counsel noted that WEG's industry is "highly regulated." (Docket No. 98 at 56).

[3] Parsons testified that she was brought onboard after WEG acquired her prior firm, Hawkins Wealth Management. (Docket No. 46-5 at 4–5, Parsons Dep. 13:22–14:7). Defense counsel explained that WEG typically integrates the employees from an acquired firm into their workforce as "part of the deal," and these employees "don't have any sort of special deal, they just come on." (Docket No. 98 at 9).

46-5 at 6–7, Parsons Dep. 20:6–13, 23:13–24:3). A few months later, in late June or early July, Fox notified WEG that she was pregnant. (Docket No. 72 ¶ 2). Parsons does not recall the exact date on which she learned of Fox's pregnancy but does not believe that it was during the same month she joined the team. (*Id.* ¶ 3; Docket No. 46-5 at 7, Parsons Dep. 24:14–25:3).

Defendant alleges that Parsons started noticing performance issues with Fox's work around June 2023, which Fox disputes. (Docket No. 75 ¶ 14). Nevertheless, Defendant submitted the notes Parsons kept regarding Fox's performance issues as an exhibit.[4] These notes begin on June 15, 2023 and provide that Fox was late to their scheduled one-on-one meeting that day. (Docket No. 80-2). According to Parsons' notes, she was late to two more meetings the following month. (*Id.*). Parsons also wrote that she "noticed the productivity for July wasn't where it should be" and that Fox had only processed 42 applications that month. (*Id.*). It is undisputed that Parsons spoke with her manager, Dan Hogan ("Hogan"), about these performance issues on August 1, 2023. (Docket Nos. 80-3 at 5; 75 ¶ 18). Hogan directed Parsons to document her efforts to address Fox's performance and to keep him updated on her progress. (Docket No. 75 ¶ 19).

The next day, on August 2, 2023, Parsons emailed Hogan with an update on her one-on-one meeting with Fox. (Docket No. 80-3 at 5). Parsons said that they discussed the project on which Fox was working, Project Nova, as well as "productivity levels" and "the importance of tracking the work and documentation." (*Id.*). She noted that Fox "seem[ed] to be tracking in her own notebook, then updating the spreadsheet in bulk" which was "duplicative." (*Id.*). Fox acknowledged that there was a period of time where she tracked her work in a notebook and then

---

[4] The Court notes that Plaintiff objected to WEG's submission of Parsons' notes as inadmissible hearsay under Federal Rule of Evidence 803(6)(b), an objection which the Court overruled on March 30, 2026. (Docket No. 74). *See* § III at 11, *infra*.

"also mov[ed] [her] tracking information into the spreadsheet." (Docket No. 46-1 at 31, Fox Dep. 121:20–25).

A few weeks later, on August 17, 2023, Parsons met with Fox and another team member, Anna Wolbrock ("Anna W"), who was also having difficulties processing accounts for Project Nova. (Docket No. 72 ¶ 39). Parsons emailed her notes from the meeting to Hogan, which stated that "[t]he purpose of the discussion was to set clear expectations on utilizing the process, set a weekly productivity goal, and drive accountability for moving this project forward." (Docket No. 80-3 at 4). Parsons noted that both Fox and Anna W "continue[d] to utilize separate tracking methods" and did not "get information into the shared tracking spreadsheet in real time." (*Id.*). Parsons wrote that she "laid out clear expectations for how [she] would like them to utilize their time and what the expectation is for processing," i.e., "Tues, Wed, Thurs will be dedicated to processing only. The goal for this week is to process at minimum 25 new applications each per day. Mon, Fri will be dedicated to following up/confirming submissions and tracking down additional information for NIGO's."[5] (*Id.*).

In August 2023, Fox advised Parsons that she was unable to attend WEG's "2023 M&A Summit" in Minnesota in-person because her physician recommended that she not travel. (Docket No. 47-5 at 27, Parsons Dep. 103:12–17). Fox testified that Parsons "questioned [her] commitment to [the] team" and "made [her] say out loud" that "[she is] committed to the team" because "she missed going to the seminar." (Docket No. 46-1, Fox Dep. 157:14–23). However, Parsons testified that she does not believe she ever asked Fox if she was committed to the team, and she never asked her to state it out loud. (Docket No. 46-5 at 8–9, Parsons Dep. 29:16–25).

[5] Parsons explained that "after paperwork is submitted, it either gets an IGO or a NIGO notation," the latter of which stands for "Not in Good Order." (Docket No. 46-5 at 28, Parsons Dep. 107:22–108:2).

On September 18, 2023, Parsons sent the following email to a Human Resources ("HR") Business Partner, Sara Lommel ("Lommel"): "I have one team member that I've been having performance conversations with and documentation [sic] those with my supervisor, Dan Hogan. I'm not seeing improvement and need to figure out the next steps. Would you be free tomorrow or Wednesday for a quick chat?" (Docket No. 38-8 at 2). Fox admits that she was the employee referenced in this email. (Docket No. 75 ¶ 32). A few days later, on September 21, Parsons met with Fox and sent a summary of their meeting to Lommel afterwards. (Docket No. 80-3 at 2). Parsons wrote that they discussed Fox's productivity and Parsons' concern that she was not "getting [Fox's] full working capacity in the work week." (*Id.*). She also wrote that they talked about Fox's "frustrations with her current project and the work being repetitive/monotonous." (*Id.*).

The next entry from Parsons' notes on Fox's performance is dated September 27, 2023 and states: "I had to bring in another member of our team to review and follow up on Amy's work. She wasn't completing the follow up and tracking steps, despite multiple conversations. A list of 178 accounts was prepared and reviewed by another team member. The list consisted of accounts that had not been followed up on dating back to June." (Docket No. 80-2 at 5). Parsons' deposition testimony indicates that the other employee brought in to review Fox's work was Michelle Greve ("Greve"). (Docket No. 46-5, Parsons Dep. 113:5–24). Fox testified that, at some point during her pregnancy, Greve also became pregnant. (Docket No. 46-1 at 21, Fox Dep. 78:6–9).

Prior to becoming pregnant, Fox had been able to take time off for medical appointments without using paid time off ("PTO"). (Docket No. 72 ¶ 7). After Fox became pregnant and needed time off for medical appointments, she reached out to HR to inquire about the PTO policy. (*Id.* ¶ 8). On September 21, 2023, Fox spoke with Rachel Heidt in HR ("Heidt") regarding PTO and

FMLA. (Docket No. 46-2 at 7, Heidt Dep. 23:17–24:12). Heidt told Fox that if she took less than four hours off in a day to attend medical appointments, she did not have to use PTO, as long as it was "within reason and periodic." (Docket No. 72 ¶¶ 9–10). But, Heidt testified that she told Fox that "ultimately, the manager is making those decisions." (Docket No. 46-2 at 8–9, Heidt Dep. 29:24–30:1). Eventually, Fox disclosed why she was asking about the PTO policy—i.e., "several [doctor's] appointments related to her pregnancy" and "the distance [and] travel required." (*Id.* at 7, 24:20–25:5). Heidt told Fox that she should submit FMLA paperwork so WEG "could better understand the time she needed for her medical [appointments]." (*Id.* at 8, 26:5–8). Heidt testified that she subsequently provided Fox with the necessary paperwork and there were no issues submitting or approving it. (*Id.* at 8, 26:9–16, 28:3–5). She further testified that Fox's FMLA leave could have covered her medical appointments, but Fox "was very adamant that she use her full twelve weeks of FMLA once the baby was born." (*Id.* at 10, 36:21–25).

Shortly thereafter, Fox emailed Parsons advising that "HR had given her some information that was different than what [Parsons] had asked her to do." (Docket No. 46-5 at 8, Parsons Dep. 26:25–27:6). According to Fox, at some point after her conversation with Heidt, she told Parsons that she had a medical appointment and Parsons directed her to "punch out for [her] time." (Docket No. 46-1 at 9, Fox Dep. 31:18–20). Fox called Heidt about this and Heidt allegedly told her that the PTO policy for medical appointments did not "apply to [her] because [she] was underperforming." (*Id.* at 32:1–3). Heidt testified that Lommel had advised her that there were performance concerns with Fox generally, but Heidt: (1) never told Fox that she was underperforming, (2) never spoke with Parsons about these issues, and (3) was not aware of any details regarding Fox's performance. (Docket No. 46-2 at 18, Heidt Dep. 67:13–68:4).

On October 17, 2023, Heidt sent an email to Fox regarding her FMLA paperwork and reiterated that Fox was expected to "work with [her] manager to determine if PTO should be utilized or not." (Docket No. 50-1). She also added that "as a general guideline, if you are meeting your weekly goals and/or able to make up the time, you may be able to attend these appointments without submitting PTO." (*Id.*). Fox confirmed that she received "all the time off that [she] needed" for her medical appointments. (Docket No. 46-1 at 45, Fox Dep. 174:17–20).

Around this same time, one of Fox's other team members, Laura Sokolowski ("Sokolowski"), met with her to review the account opening process at Parsons' request. (Docket No. 75 ¶ 44). Fox alleges that the purpose of the meeting with Sokolowski was to compare her process with another employee's "to verify that [she] was completing the account opening process appropriately." (Docket No. 97). Parsons account is fairly consistent with Fox's, although she characterizes the meeting as a "training." (Docket No. 90-1). Regardless, it is undisputed that Parsons, Fox, and Sokolowski met via video conference to review the account opening process sometime in October 2023, and their meeting was recorded.[6] (Docket Nos. 75 ¶ 44; 90-1 ¶ 3; 97).

At some point in October or November 2023, Parsons began tracking weekly goals for each team member on Project Nova and sending updates to the Transition Support Team by email. (Docket No. 72 ¶ 33). Parsons testified that the "goals would fluctuate from week to week for each team member, depending on what was going on," such as "time off, capacity, if they were working on other projects," *inter alia*. (Docket No. 46-5 at 35, Parsons Dep. 135:1–5). There are only two weeks in these "weekly goal" emails in which Fox had a goal over zero: (1) between

---

[6] Parsons attempted to access this recording from WEG's computer system in May 2026, but it was not preserved. (Docket No. 90-1). Based on the record before the Court, spoliation is not apparent. *See Moore v. Lamas*, No. 22-1007, 2023 WL 371397, at *3 (3d Cir. Jan. 24, 2023) ("Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party.").

October 23, 2023 and October 29, 2023, where her goal was 45 accounts and she closed 14; and (2) between October 30, 2023 and November 5, 2023, where her goal was 30 accounts and she closed zero. (Docket No. 46-8 at 2–4).

According to Parsons' notes, she met with Fox on November 2, 2023, and the meeting "wasn't intended to be a full performance discussion, but it went in that direction and the call didn't go all that well." (Docket No. 80-2 at 6). The notes indicate that they discussed many of the same issues they had already gone over—Fox's failure to meet weekly goals, the use of PTO or flex time to make up for doctor's appointments, and Fox's belief that the goals for Project Nova were "unrealistic." (*Id.*). Fox was reportedly "adamant" that HR be on their follow-up call the following week. (*Id.* at 7). Fox spoke with Heidt that same day and stated that she wanted to file a complaint about "Parsons' treatment." (Docket No. 72 ¶ 63). Thereafter, Heidt told Lommel that Fox wanted to file a complaint. (*Id.* ¶ 65).

Lommel met with Fox on November 8, 2023. (Docket No. 50-3 at 1). Lommel recalled that Fox sought clarity on "three main concerns" during the meeting: (1) from whom she was supposed to take directives regarding assignments and the projects on which she was working; (2) "time off" because she was under the impression that "she could be away from work for extended periods of time and not submit and use PTO;" and (3) "goals versus expectations" and "what she needed to complete in terms of her work." (Docket No. 46-4 at 12, Lommel Dep. 43:5–20). Parsons testified that Lommel reached out to her at some point and advised that Fox wanted to file a formal complaint, but she could not recall whether the complaint was "specifically about [her] pregnancy." (Docket No. 46-5 at 8, Parsons Dep. 28:8–29:2). However, Fox testified that she "expressed pregnancy discrimination" to Lommel, particularly with respect to "not being given

the same type of opportunities as my co-workers to work on different projects in the same capacity." (Docket No. 46-1 at 62, Fox Dep. 243:20–25).

Fox began to search for other positions within WEG during the fall of 2023. (Docket No. 72 ¶ 48). To apply for these other positions, Fox had to seek Parsons' approval. (*Id.* ¶ 49). Pursuant to WEG's "Job Posting Program" policy, employees interested in being considered for open internal positions must: (1) have worked in their current position for one year; (2) be meeting the requirements of their current position; and (3) notify their manager of their intention to submit an application for the open position. (*Id.* ¶ 51). According to WEG's Employee Handbooks dated June and November 2023, "'meeting the requirements of their current position' means that an employee has a satisfactory record of attendance and has not received disciplinary action or been placed on a Performance Improvement Plan within the past 12 months." (Docket No. 50-2 at 2, 4). During this time, Parsons twice signed off on Fox's application for another position within WEG, on August 29, 2023 and again on November 2, 2023. (Docket No. 72 ¶ 53).

Fox started her maternity leave on December 8, 2023, the same day she gave birth, according to her Amended Complaint.[7] (Docket Nos. 75 ¶ 52; 30 ¶ 32). In February and March 2024, Parsons awarded Fox her full bonus and merit increase. (Docket No. 72 ¶ 58). As a practice, WEG gives a standard merit increase of four percent annually, then any adjustments within the Transition Support Team is at the manager's discretion. (*Id.* ¶ 56). Managers also have discretion to reduce the amount of an employee's bonus. (*Id.* ¶ 57). HR had advised Parsons that she should weigh Fox's performance when deciding how to allocate her merit budget among her team. (*Id.* ¶ 55).

---

[7] The Court notes that Fox was on bereavement leave between December 5 and December 7, 2023, meaning she was already away from work when her maternity leave started on December 8, 2023. (Docket No. 48-1).

Fox's Amended Complaint alleges that she returned from maternity leave on March 4, 2024. (Docket Nos. 30 ¶ 34; Docket No. 98 at 19–20). Two days later, Fox's pregnant coworker, Greve, went on maternity leave. (Docket No. 37-1). Thereafter, on April 3, 2024, Parsons sent Fox an email providing her with a copy of her performance evaluation and letting her know that they would be meeting later that morning to discuss the annual performance review that was completed during her maternity leave. (Docket No. 72 ¶ 74). The other employees' performance reviews, such as Anna W's, occurred during Fox's maternity leave.

On Anna W's annual review, Parsons noted one "performance goal," and also noted one "performance goal" on Fox's annual review. (Docket No. 72 ¶ 90). To that end, Anna W's performance goal stated:

> You consistently have to do items on our weekly team meetings for weeks at a time. A couple of recent examples include the [redacted] issues and the document naming convention. It impacts the team when these tasks aren't completed timely. With [redacted], we all agreed on the next step and were communicating with them what to expect. With the naming convention you felt passionate about getting that in place and volunteered for that task and then it sat on the list for 6 weeks.

(Docket No. 46-7 at 1–2). Whereas Fox's performance goal provided that "[t]he two areas" she should "focus on" are "timely follow up of client documents" and "accurate tracking/reporting of account transition," specifying:

> Timely follow up – in completing the account follow up process for you, we've uncovered several instances of accounts closing at LPL due to lack of follow up ([redacted] as examples). I'd like to work with you on time blocking and how you are keeping your work organized when there is a busy workflow.
>
> …
>
> Tracking/Reporting – we outlined several examples of incomplete tracking prior to your leave that you were asked to review and clean-up. We will review the process and ensure there is clear understanding of what is expected going forward. The team is also working on a standard tracking template so all projects will look the same moving forward, which should help your process.

(Docket No. 46-6 at 1). During Fox's annual review meeting in April 2024, she declined to have a conversation about her performance, stating several times that she wanted to have someone from

HR on the call to represent her. (*Id.* ¶ 75). As such, Parsons paused the part of the meeting related to Fox's performance review and let her know that she would follow up with HR. (*Id.* ¶ 77). While Fox and Parsons did not review her performance during their meeting, the next paragraph under Anna W's "performance goals" reads: "Great discussion here – we'll both commit to communicating about deadlines and seek clarity. Love the shift in mindset around this and reframing it as impact to the team. You are an important part of what we do and the team relies on you." (Docket No. 46-7 at 2).

Fox also emailed Lommel directly on April 3, 2024, indicating that she was very uncomfortable working with her manager and being evaluated by her at this point. (*Id.* ¶ 78). Lommel did not respond to Fox's email. (*Id.* ¶ 79). Parsons spoke to Lommel about her meeting with Fox earlier that morning, during which Parsons made the decision to terminate Fox's employment. (*Id.* ¶ 81). On April 9, 2024, WEG terminated Fox's employment. (*Id.* ¶ 82). While the exact date on which Greve returned from her maternity leave is unclear, it is undisputed that Parsons promoted her to Transition Support Team Manager on June 6, 2024. (Docket No. 80-6).

## III. PROCEDURAL HISTORY

As noted, Plaintiff brought claims for sex/pregnancy discrimination and retaliation in violation of Title VII (Counts I and II), retaliation in violation of the Pregnant Workers Fairness Act (Count III) and the Family Medical Leave Act (Count IV), and discrimination/retaliation in violation of the PHRA (Count V). (Docket No. 30). After completion of discovery and an unsuccessful ADR session, (Docket No. 25), Defendant then moved for summary judgment. (Docket No. 36). Approximately one month later, the parties stipulated to dismiss Counts III and IV of the Amended Complaint, leaving only the claims under Title VII and the PHRA at Counts I, II, and V remaining. (Docket Nos. 40; 41).

Defendant filed a motion for leave to file certain exhibits under seal alongside its Motion for Summary Judgment. (Docket Nos. 34; 35). On February 6, 2026, the Court held a video status conference on the motion to seal, during which the Court noted that, Plaintiff (in her response to Defendant's Concise Statement of Material Facts) objected to two of the exhibits Defendant sought to seal as inadmissible hearsay under Federal Rule of Evidence 803(6)(b). (Docket No. 55). As such, the parties submitted further briefing on Plaintiff's hearsay objections at the Court's direction. (Docket Nos. 56; 58; 63; 68; 71). After this issue was fully briefed, the Court issued a Memorandum Opinion and Order overruling Plaintiff's hearsay objections on March 30, 2026. (Docket Nos. 73; 74). The Court also granted Plaintiff leave to amend her response to Defendant's statement of facts to the extent the Court's disposition of her hearsay objections changed or modified the sections where she raised said objections. (Docket No. 74). Plaintiff filed her amended response on April 7, 2026, wherein she renewed her hearsay objections. (Docket No. 75). The Court held a video status conference on April 9, 2026 to address these previously resolved objections, during which Plaintiff's counsel advised that Plaintiff maintained these hearsay objections in her amended response to preserve them for future proceedings. (Docket No. 79). On April 8, 2026, the Court issued a Memorandum Opinion and Order denying Defendant's motion for leave to file documents under seal. (Docket Nos. 76; 77). Thereafter, Defendant filed unredacted copies of the exhibits it had previously sought to seal on April 10, 2026. (Docket No. 80).

On May 20, 2026, the Court held oral argument on Defendant's Motion for Summary Judgment, the official transcript of which was filed on June 23, 2026. (Docket Nos. 88; 98). Following the hearing, the Court directed Defendant to supplement the record with the "training video" referenced in paragraph 44 of its Concise Statement of Material Facts, or if the video had

not been preserved, an affidavit from an individual at WEG who is familiar with the material in the video. (Docket No. 89). Defendant filed a declaration from Parsons on May 27, 2026, wherein she advised that she had been unable to access the "training video" on WEG's system, *inter alia*. (Docket No. 90-1). In response, Plaintiff filed a motion for leave to file her own declaration regarding the training video on June 3, 2026, which Defendant opposed. (Docket Nos. 91; 93). After Plaintiff filed a reply brief on June 17, 2026, (Docket No. 95), the Court issued a Memorandum Order granting Plaintiff leave to file her own declaration and overruling Defendant's objection to same on June 18, 2026. (Docket No. 96). Plaintiff submitted her declaration the same day. (Docket No. 97).

As the parties' underlying motions and objections have been resolved, and Defendant's Motion for Summary Judgment has been fully briefed and argued, it is now ripe for disposition.

## IV. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a). A genuine dispute of material fact is one that could affect the outcome of the litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden,

the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## V. DISCUSSION

WEG sets forth several arguments in support of its Motion for Summary Judgment. (Docket No. 39). First, it contends that Plaintiff has failed to present any evidence to support a nexus between her sex/pregnancy and termination beyond her own speculative belief that she was treated differently, which is insufficient to survive summary judgment. (*Id.* at 10–11). Even if Plaintiff can establish a prima facie case, WEG maintains that she cannot establish that its legitimate, non-discriminatory reason for terminating her—that is, her poor performance—is pretextual. (*Id.* at 11–13). Finally, WEG denies that Plaintiff ever reported pregnancy discrimination and argues that, even if she did, she cannot establish a causal connection between any such complaint and its adverse employment action because the reason for her termination (i.e., poor performance) existed prior to her engaging in any protected conduct. (*Id.* at 13–15). In

response, Fox contends that disputed issues of material fact preclude summary judgment. (Docket Nos. 43; 61). The Court addresses each of these arguments, in turn.

A. Sex/Pregnancy Discrimination in Violation of Title VII and the PHRA

Plaintiff alleges that Defendant unlawfully terminated her because of her sex/pregnancy in violation of Title VII and the PHRA. (Docket No. 30). Title VII forbids an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act amended Title VII to specifically state that the terms "because of sex" or "on the basis of sex" include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "Similarly, the PHRA's prohibition against sex discrimination encompasses pregnancy discrimination." *Tomiak v. Unilog Content Sols., LLC*, No. CV 25-1685, 2026 WL 1358698, at *3 (E.D. Pa. May 14, 2026).[8]

Where, as here, there is no direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting paradigm. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *see also U.S. Equal Emp. Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 652 (W.D. Pa. 2017). "To establish a prima facie case of pregnancy-related discrimination under Title VII and the PHRA, a plaintiff must show that (1) 'she is or was pregnant and that her employer knew she was pregnant,' (2) 'she was qualified for her job,' (3) 'she suffered an adverse employment decision,' and (4) 'there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination.'"

---

[8] "The Third Circuit construes Title VII and the PHRA consistently with each other." *Cavanaugh v. Wal-Mart Stores E., LP.*, 733 F. Supp. 3d 362, 369 n.1 (M.D. Pa. 2024) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F. 3d 535, 539 n.5 (3d Cir. 2006)).

*Donnelly v. Cap. Vision Servs., LLC*, 644 F. Supp. 3d 97, 104–05 (E.D. Pa. 2022) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008)).

Here, Defendant does not challenge the first three elements of Plaintiff's prima facie case. Instead, Defendant contends only that Plaintiff cannot establish the fourth and final element because the record both is "devoid of evidence of discrimination," and "clearly shows that Plaintiff was treated the same as employees outside of her protected class." (Docket No. 39 at 10–11). Defendant's concession of the first element of the prima facie case is curious given that Fox was not pregnant at the time of her termination, "meaning she cannot demonstrate her membership in a protected class." *Tomiak*, 2026 WL 1358698, at *5. Indeed, Fox gave birth approximately four months before her termination and she does not allege that "she remained affected by a pregnancy- or childbirth-related medical condition" at the time of her dismissal. *Anderson v. Boeing Co.*, 694 F. App'x 84, 87 (3d Cir. 2017). *See also Harrell v. Solebury Twp.*, No. CV 19-2809, 2020 WL 833803, at *7 (E.D. Pa. Feb. 20, 2020) (explaining that a plaintiff who is not pregnant at or near the time of the adverse employment action must demonstrate "that she was affected by pregnancy, childbirth or related medical conditions" at the prima facie stage). Because Fox "does not tie her claim to being pregnant, her labor, or any related medical conditions of pregnancy or childbirth," she has failed to establish her membership in a protected class.[9] *Tomiak*, 2026 WL 1358698, at *5. Given same, Plaintiff's sex/pregnancy discrimination claims under Title VII and the PHRA

---

[9] To the extent Plaintiff argues that her pregnancy affected Parsons' attitude toward or treatment of her during the four months that passed between her childbirth and her termination, the facts she relies on to support this position all occurred *before* she went on maternity leave. *See Solomen v. Redwood Advisory Co.*, 183 F. Supp. 2d 748, 755 (E.D. Pa. 2002). *See, e.g.*, Docket No. 43 at 10 (alleging there was a "pattern of antagonism" because Parsons "questioned Fox's commitment to the team" when she could not attend WEG's "M&A Summit" in August 2023); *id.* at 10–11 (arguing that WEG provided Fox with "contradictory information on how time off for medical appointments should be handled" in the fall of 2023). Thus, Fox "cannot establish that she was affected by the pregnancy at or near the time of her termination and therefore, she fails to make out a prima facie case of pregnancy discrimination." *Solomen*, 183 F. Supp. at 755.

cannot survive summary judgment. Nevertheless, the Court will continue its analysis under the *McDonnell Douglas* framework in light of Defendant's concession on this point.

For present purposes, the Court will assume that a prima facie case has been established with respect to Plaintiff's discrimination claim because the burden at the prima facie stage is "much less onerous than proving pretext with similar evidence." *Rhoden v. Children's Hosp. of Pittsburgh*, No. 2:14-0411, 2017 WL 4224655, at *4 (W.D. Pa. Sept. 22, 2017) (quoting *Opsatnik v. Norfolk S. Corp.*, Civil Action No. 06-81, 2008 WL 763745, at *4 (W.D. Pa. March 20, 2008); *see also Moussa v. Pa. Dep't of Pub. Welfare,* Civil Action No. 07-9, 2010 WL 1333333, at *8 (W.D. Pa. March 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the plaintiff's prima facie and pretext-based arguments each relied on the same evidence).

Moving on then, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for its employment decision. *Donnelly*, 644 F. Supp. 3d at 106. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). As referenced above, Defendant's articulated reason for its decision to terminate Plaintiff was her poor performance, as well as her lack of accountability, and it provides Parsons' deposition testimony, notes, and email correspondence in support. (Docket Nos. 38; 48; 50; 80). This articulated reason satisfies WEG's relatively light burden of offering a legitimate, non-discriminatory reason for the adverse employment decision.

To defeat Defendant's Motion for Summary Judgment, Plaintiff "can establish pretext by pointing 'to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Donnelly*, 644 F. Supp. 3d at 106–07 (quoting *Fuentes*, 32 F.3d at 764). "Put another way, to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." *C.A.R.S.*, 527 F.3d at 370.

Under the first prong, "a plaintiff must present evidence demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered reasons 'that a reasonable factfinder could rationally find them unworthy of credence,' and infer that the defendant did not act for the stated non-discriminatory reasons." *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 630 (W.D. Pa. 2019) (quoting *Fuentes*, 32 F.3d at 765). To do so, Plaintiff "cannot simply show that the employer's decision was wrong or mistaken" because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

Under the second prong, "a plaintiff can demonstrate pretext if she can demonstrate that discrimination 'was more likely than not a motivating or determinative cause of the adverse employment action.'" *Parish*, 373 F. Supp. 3d at 633 (quoting *Fuentes*, 32 F.3d at 762). "Pretext can be shown in this way by producing evidence that: 1) the employer previously has discriminated against the plaintiff; 2) the employer has discriminated against other persons; or 3) the employer has treated more favorably similarly situated employees outside of the plaintiff's protected class." *Zerfa v. Acosta, Inc.*, No. CV 21-463, 2023 WL 2713914, at *6 (W.D. Pa. Mar. 30, 2023) (citing *Fuentes*, 32 F.3d at 765).

Fox offers eight bases to support the argument that there are "inconsistencies" in Defendant's reason for terminating her: (1) Parsons told Fox that the weekly goals were "not for evaluation," intended to "gauge project completion," and would not be used to evaluate anyone's performance; (2) Project Nova was an "incredibly difficult project;" (3) "others on the team did not meet the weekly goals set for Project Nova but were not terminated;" (4) Anna W had alleged performance issues but was not terminated; (5) Fox was in good standing to apply for internal positions; (6) Fox received a bonus and merit increase in early 2024; (7) WEG offered an explanation for Fox's termination in an interrogatory answer that allegedly contradicted Parsons' testimony; and (8) in its EEOC Position Statement, WEG claimed that Fox was "failing to communicate when she was away from the office by September 2023," which is rebutted by Parsons' testimony. (Docket No. 43 at 11–14). The Court addresses each of these arguments below.

First, it is undisputed that, at some point in October or November 2023, Parsons began tracking the weekly goals for Project Nova and emailing updates to the Transition Support Team. (Docket No. 72 ¶ 33). Fox maintains that Parsons told her that the weekly goals were intended to "gauge project completion" and would not be used to evaluate anyone's performance. (Docket No. 43 at 12). Fox also contends that other members of the Transition Support Team did not meet their weekly goals for Project Nova but, unlike her, were not terminated. (*Id.* at 13).

Plaintiff offers no evidence to suggest that Parsons considered the "weekly goals" for Project Nova in deciding to terminate her. Moreover, in this Court's estimation, Plaintiff overstates any potential import of the "weekly goal" reports. The emails show that, between November 6, 2023 to December 3, 2023, the weekly goal set for Fox was zero. (Docket No. 46-8). In other words, there are only two weeks in which Fox had a weekly goal over zero: between

October 23, 2023 and October 29, 2023 and between October 30, 2023 and November 5, 2023. (*Id.* at 2–4). According to Parsons, the "goals would fluctuate from week to week for each team member, depending on what was going on," such as "time off, capacity, if they were working on other projects," *inter alia*. (Docket No. 46-5 at 35, Parsons Dep. 135:1–5). So, while it does appear that "no one on the team was consistently meeting" their weekly goal for Project Nova, the goal set for each individual and the number of accounts they completed varied significantly from week to week. These email updates simply leave too many unknowns for the Court to conclude that Plaintiff was performing similarly to her non-pregnant coworkers such that a reasonable factfinder could find WEG's proffered basis for terminating Plaintiff unworthy of credence. *See Parish*, 373 F. Supp. 3d at 630.

Relatedly, Plaintiff does not explain how the difficulty or complexity of Project Nova demonstrates inconsistencies or contradictions in WEG's termination rationale. *See id.* Defendant does not dispute that Project Nova was difficult. (Docket No. 72 ¶ 30). Nor does it challenge any of the facts Plaintiff highlights to argue same—i.e., that she would go through hundreds of pages of documents in order to process an account and sometimes find errors, or that Transition Support employees encountered things beyond their control, including incomplete and inaccurate information from the clients. (*Id.* ¶¶ 26–32). Defendant maintains that "all employees had to follow the same standardized procedure to process and open an account." (*Id.* ¶¶ 26–28). Moreover, other employees, including Anna W, also worked on Project Nova; and Plaintiff does not rebut record evidence that weekly goals were adjusted on various bases, including capacity and projects; and as discussed above, Plaintiff provides no record support for her claim that such goals were a factor in her termination. Thus, Project Nova's asserted level of difficulty fails to

demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in WEG's proffered reason for her termination. *Fuentes*, 32 F.3d at 765.

Next, Plaintiff argues that her work performance was not deficient because she was "in good standing to apply for internal positions." (Docket No. 43 at 14). However, "being in good standing" to apply for other positions within WEG only required her to be "meeting the requirements of [her] current position," which meant that she had "a satisfactory record of attendance" and had "not received disciplinary action or been placed on a Performance Improvement Plan within the past 12 months." (Docket No. 50-2 at 2, 4). This standard is too generic to infer that Plaintiff was performing satisfactorily simply because Parsons signed off on her applications.[10] Likewise, Plaintiff highlights that she received a bonus and merit increase in early 2024, but Parsons testified that *everyone* on the Transition Support Team received their full bonus and merit allocation in 2024. (Docket No. 46-5 at 20, Parsons Dep. 76:24–25). Plaintiff does not explain how the receipt of the *standard* merit and bonus amount in the beginning of 2024 discredits WEG's legitimate, non-discriminatory reason for her termination. Even viewing the record in the light most favorable to Plaintiff, neither Parsons' approval of her applications for other positions at WEG nor allocation of the annual bonus/merit amount demonstrates weaknesses in the proffered reasons such that a reasonable factfinder could infer that WEG did not act for its stated non-discriminatory reasons. *See Parish*, 373 F. Supp. 3d at 630.

Plaintiff next asserts that WEG offered an explanation for her termination in an interrogatory answer that purportedly "contradicted itself." (Docket No. 43 at 15). This assertion appears to rely on an alleged contradiction between: (1) the following select response Parsons gave at her deposition:

---

[10] To the extent Fox indicated that she was unhappy in her role or desirous of a different position within WEG, it would appear to the Court that Parsons was aiding her in finding such opportunities.

> Q. You indicated that you made the decision to terminate Ms. Fox because you had had the same performance conversation with her multiple times and there was no improvement in the quality of her work. Is there any other reason that you made the decision to terminate Ms. Fox? A. There is not.

(Docket No. 46-5 at 12, Parsons Dep. 44:1–7); and (2) the response to an interrogatory which asked Defendant to "[i]dentify each and every reason why [it] terminated Plaintiff on or about April 9, 2024," and to which Defendant responded that it terminated her "because of (1) documented performance and communication issues that did not improve despite repeated discussions with Plaintiff attempting to address them; and (2) Plaintiff's repeated statements expressing dislike for her position and job assignments." (Docket No. 46-11 at 3). Yet Fox does not even attempt to explain how these two responses are "contradictory." (Docket No. 43 at 15). Instead, she simply challenges the veracity of WEG's contention that she expressed dislike for her job by relying on an email she sent to Parsons on August 18, 2023, stating, "I'm not unhappy in any way with my position with the [T]ransition [S]upport [T]eam, but would like to grow my career in another direction if the right opportunity presents itself." (Docket No. 72 ¶ 86). At bottom, however, there is simply nothing contradictory in Defendant's assertions that the reasons for Fox's termination: (1) were encompassed in performance conversations, and (2) included performance and communication issues that did not improve, as well as Plaintiff's own dissatisfaction with her job.

The other purported "inconsistency" raised by Plaintiff is based upon the following portion of Defendant's EEOC Position Statement:

> By September 2023, Complainant was also failing to communicate when she was away from the office. For example, between September and December 2023, Complainant frequently needed time off to attend to family matters and to attend doctor appointments related to her pregnancy. WEG had no concerns with her taking time away from work. However, Complainant would be away from the office without telling anyone ahead of time.

(Docket No. 46-9 at 2). Plaintiff argues that this contradicts Parsons' deposition testimony that "[t]owards the end of September," Fox was "doing a better job of keeping [her] informed in advance" of her appointments. (Docket No. 46-5 at 54, Parsons Dep. 211:7–9). Defendant counters that Fox's "communication issue was with the team as a whole, not with Ms. Parsons personally." (Docket No. 72 ¶ 47). Fox's purported improvements in communicating do not necessarily reflect an absence of poor performance on her part. "Doing better" does not mean resolved; in fact, it means *not* yet resolved. Further, she "has presented no evidence that other employees were permitted to" take time away from work without advising of their absence beforehand "without consequence, or that attendance issues were otherwise a ruse for gender discrimination." *Weightman v. Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693, 710 (W.D. Pa. 2011).

Plaintiff's final basis for demonstrating pretext is that her non-pregnant coworker, Anna W, also struggled with tracking and meeting deadlines. An employer's favorable treatment of similarly situated employees outside the plaintiff's protected class falls under the second prong of the pretext analysis. *See Zerfa*, 2023 WL 2713914, at *6. In assessing whether an employee is similarly situated to a plaintiff, "[t]he two most important factors" are "the nature of the offenses perpetrated by the employees and the punishments imposed." *May v. PNC Bank*, 434 F. Supp. 3d 284, 297 (E.D. Pa 2020). Other relevant factors "include whether the employees dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities." *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024). In sum, "comparator employees need not be identical but must be similarly situated in 'all material respects.'" *Id.* (quoting *In re Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)).

Here, Fox and Anna W both had the same supervisor, Parsons, and shared similar job responsibilities on the Transition Support Team, which subjected them to the same standards. *See Qin*, 100 F.4th at 474. WEG does not dispute that Parsons also had concerns about Anna W's job performance, which she discussed with Hogan approximately "two to five times." (Docket No. 72 ¶ 87). Nor does it dispute that Parsons met with Fox and Anna W on August 17, 2023 to discuss processing for Project Nova, noting that both Fox and Anna W utilized separate tracking methods and were not submitting information into the share tracking spreadsheet in real time. (Docket No. 80-3). However, Defendant argues that Anna W is not a proper comparator because she was "receptive to feedback, wanted to improve, and did improve." (Docket No. 52 at 4). Plaintiff replies that there is no evidence in the record, "other than Parson's [sic] subjective statement that Anna W was receptive to feedback, to show that [her] performance actually improved or that she began meeting the Project [Nova] weekly goals;" but despite having the burden of proof, she fails to rebut this testimony. (Docket No. 61 at 3).

Plaintiff does point to the 2023 annual performance reviews in support of her position, noting that Parsons recorded a performance goal on both Fox's and Anna W's annual reviews, which she argues contradicts Defendant's assertion of receptivity or improvement on Anna W's behalf. (Docket No. 43 at 14). This is a non-sequitur: one can be open to improvement and can improve while still having unmet performance goals. Indeed, that is often the context in which improvement is called for. Moreover, all performance reviews are not equal.[11] To that end, Anna W's performance goal involved leaving internal "to-do" items for weeks at a time (thus affecting the team's output). In contrast, Fox's performance goal concerned both "timely follow up of client

[11] The Court is mindful that "a district court is not to be in the business of substituting its judgment for that of an employer on the grounds that the employer's decision was generally unwise or even wrong." *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 309 (W.D. Pa. 2020).

documents" and "accurate tracking/reporting of account transition." (Docket Nos. 46-6; 46-7). Fox's performance review details that her noted performance challenges, unlike Anna W's, imposed additional work on her team members and had an impact on client retention. Those challenges also included continued tracking issues (an area in which Anna W had improved). *Cf. May*, 434 F. Supp. 3d at 297 (identifying "the nature of the offenses perpetrated by the employees" as a "most important factor" in assessing comparator status).

Parsons and Anna W discussed her performance goal during her annual review, as evidenced by Parsons' positive comment therein, stating, "Great discussion here" and "Love the shift in mindset around this and reframing it as impact to the team," *inter alia*. (Docket No. 46-7 at 2).[12] In comparison, when Parsons met with Fox after she returned from maternity leave, Fox declined to have a conversation about her performance, stating several times that she wanted to have someone from HR on the call to represent her. (Docket No. 72 ¶ 75). Parsons testified that, following this conversation with Fox, she decided to terminate her employment because they had had the "same conversation over and over about her performance, about the quality of work," during which there "wasn't a lot of accountability for how she could improve." (Docket No. 46-5 at 12, Parsons Dep. 42:8–16).[13]

Finally, a potential comparator's situation may not be sufficiently similar where the comparator improved over time while the plaintiff did not. *See McDonnaugh v. Teva Specialty*

---

[12] *See also* Docket No. 46-5 at 26, 98:20–25 (Parsons testifying that "[Anna W] was open. She was receptive to that feedback. She genuinely wanted to improve, and, you know, be a productive member of the team.").

[13] Parsons also repeatedly mentioned that she did not see any "accountability" from Fox, both during her deposition as well as in her notes and contemporaneous emails. *See, e.g.*, Docket No. 80-3 (Parsons emailing Lommel on September 21, 2023 that her discussion with Fox "went as expected" and "was not easy and there was no accountability taken."); Docket No. 80-2 at 6 (noting that a call with Fox on November 2, 2023 "wasn't intended to be a full performance discussion," but "it went in that direction" and "didn't go all that well."). Even though an employee's ability to take "accountability" may be a subjective evaluation, Plaintiff cannot "ultimately prove discrimination merely because his/her employer relied upon highly subjective qualities (i.e. 'drive' or 'enthusiasm') in making an employment decision."). *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000).

*Pharms.*, 489 F. App'x 550, 552–53 (3d Cir. 2012) ("[O]ne of the comparators had significantly less experience in pharmaceutical sales, but showed improvement over time. The other employee had performance problems in areas different from McDonnaugh, and also showed improvement. Such differences support a conclusion that these employees were not similarly situated to McDonnaugh."). Here, Parsons testified that Anna W was not only receptive to feedback but also actually improved her performance. *See* Docket No. 46-5 at 58, 227:19–25 ("Anna was very receptive to the feedback and wanted to improve and, you know, wanted to, you know, work towards, I guess, improving those or shoring those up and she did that."). The Court further notes that Anna W did not participate in the October 2023 video call between Fox, Sokolowski, and Parsons, the purpose of which was to review the account opening process and "*verify* that [Fox] was completing [same] *appropriately*." (Docket No. 97 ¶ 1) (emphasis added). Anna W's attendance of the meeting with Fox and Parsons on August 17, 2023, and absence at their subsequent meeting with Sokolowski in October 2023, suggests that she had shown more meaningful improvement in her performance than Fox by that time. For the foregoing reasons, the record indicates that Anna W and Fox are not actually "similarly situated in all material respects." *Qin*, 100 F.4th at 474. Rather, it presents "differentiating or mitigating circumstances" which distinguish Anna W's conduct and WEG's correspondent treatment of her as compared to Fox. *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011).

Additionally, as Defendant points out, Plaintiff's pretext arguments are further undercut by Parsons' promotion of Greve approximately thirteen weeks after she went on maternity leave. (Docket No. 39 at 11–12). Indeed, "[w]hile not conclusive, an employer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent." *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003). Here, Greve

and Fox were pregnant at overlapping times, took maternity leave right after the other, and were on the same team and performed the same work. The fact that the same decision maker promoted Greve upon her return from maternity leave indicates that the reason for Fox's termination after she returned from leave was not based on her pregnancy, but rather her work performance. *See, e.g.*, *E.E.O.C. v. Grane Healthcare Co*., No. 3:10-250, 2015 WL 5439052, at *48 (W.D. Pa. Sept. 15, 2015) ("The fact that Defendants hired other applicants similarly situated to Claimants suggests to the Court that Defendants did not have a discriminatory intent when making hiring decisions."); *Dougboh v. Cisco Sys., Inc.*, 726 F. App'x 914, 917 (3d Cir. 2018) (finding that plaintiff had failed to provide any support for an inference of racial discrimination and noting that "of the 66 individuals who were ultimately hired by Cisco, 15 self-identified themselves as 'Black' or 'African-American.'").

In sum, Plaintiff has failed to come forward with evidence to raise an issue of material fact that her termination was the product of unlawful discrimination. Instead, the record reflects that Plaintiff was terminated because of her poor performance and lack of accountability. Taking the record as a whole and construing all facts and inferences in favor of the Plaintiff, no reasonable factfinder could conclude that Defendant's proffered reason for her termination was pretext for sex/pregnancy discrimination. *See Matsushita*, 475 U.S. at 587. Therefore, Defendant's Motion for Summary Judgment on the issue of sex/pregnancy discrimination under Title VII and the PHRA will be granted.

B. Retaliation in Violation of Title VII and the PHRA

Plaintiff next claims sex/pregnancy retaliation in violation of Title VII and the PHRA at Counts II and V of her Amended Complaint. (Docket No. 30). Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he

has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

"To state a prima facie case of retaliation, a plaintiff must establish that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Parish*, 373 F. Supp. 3d at 634 (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)). As for the third element of the *prima facie* case of retaliation, "a plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action.'" *Id.* at 635 (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017)). "A plaintiff can establish a causal connection through evidence similar to that which can be used to prove a nexus in a pregnancy discrimination claim, including temporal proximity, ongoing antagonism, inconsistent reasons for termination, and certain conduct towards others." *Eck*, 2024 WL 5159886, at *7. However, "[i]n the absence of other evidence, 'the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.'" *Mercer v. SEPTA*, 608 F. App'x 60, 65 (3d Cir. 2015) (quoting *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 189 n.9 (3d Cir. 2003)).[14]

Defendant argues that Fox's retaliation claim fails because there is no evidence that she made a discrimination complaint in November 2023 or April 2024. (Docket No. 52 at 8). Fox rebuts that she engaged in protected activity when she "made a complaint to HR" and "opened an investigation" because WEG "deemed her to be an underperforming employee only after she

[14] To the same effect is *Lynn v. Bank of New York Mellon*, 180 F.4th 133 (3d Cir. 2026), which the Third Circuit issued while WEG's motion remained pending. Despite the Court's directive to counsel at the oral argument to provide such cases, *Lynn* was not brought to the Court's attention. *See* Docket No. 98 at 68.

started needing time off and missing work due to her pregnancy" and "she was not being given opportunities to work on other projects due to being pregnant." (Docket No. 43 at 18). She seems to be referencing conversations she had with Heidt on November 2, 2023, and with Lommel on November 8, 2023, where Fox maintains that she expressed "pregnancy discrimination." (*Id.* at 19; Docket No. 72 ¶ 66).

In regard to these conversations, Heidt testified that "[Fox] brought up a complaint to [her] around [Parsons] and how she was treating the entire team as it relates to level of work or work expectations. And she did state that she wanted to file a complaint against [Parsons]." (Docket No. 46-2 at 15, Heidt Dep. 56:5–10.). She denied that Fox mentioned anything about Parsons "targeting her . . . because of her pregnancy." (*Id.* at 56:21–25). Lommel likewise denied that Fox ever reported or mentioned experiencing pregnancy discrimination from Parsons. *See* Docket No. 46-4 at 27, Lommel Dep. 102:1–10 ("[D]id Amy Fox ever express to you that she felt that Ms. Parsons began to treat her differently after she needed time off for her pregnancy or after the summit team meeting had occurred that Amy could not attend in person? A. No. My recollection of what Amy had said was that she felt since working with Ms. Parsons, that they didn't have a good working relationship. Nothing to do with pregnancy, needing time off or attending the summit.").

Even if Fox did express "pregnancy discrimination" to Heidt or Lommel, these conversations occurred in November 2023, nearly five months before her termination in April 2024. As the evidence offered to establish a "causal link" is the same that Plaintiff proffered to show "pretext" for her discrimination claim, the Court need not readdress why this evidence is insufficient to "raise the inference that her protected activity was the likely reason for the adverse [employment] action." *Parish*, 373 F. Supp. 3d at 635. *See* § IV.A, *supra*. In the absence of other

evidence, she fails to establish an "unduly suggestive" temporal proximity between these purported complaints to HR and her termination. *See Donnelly*, 644 F. Supp. 3d at 112 (three months between termination and protected activity insufficient to establish temporal proximity). In fact, the Third Circuit has stated that "[t]he adverse action must occur within days, not months, of the protected activity." *Mercer*, 608 F. App'x at 65. Further, Fox has not presented any evidence indicating that Parsons' treatment or demeanor toward her changed after she spoke with Lommel and Heidt in November 2023. *See Ward v. Ingersoll-Rand Co.*, 688 F. App'x 104, 110 (3d Cir. 2017) (no inference of discrimination where there was "no indication that [the employer's] treatment of [plaintiff] changed after his medical leave.").

Nevertheless, Fox also maintains that her request for a representative from HR to join the call between her and Parsons when discussing her performance on April 3, 2024, and subsequent email to HR on that same day, is protected activity. (Docket No. 43 at 20). With respect to her email to HR, Fox wrote:

> I would like to work with an HR representative regarding ongoing issues with my current manager that we are unable to resolve with meaningful conversation. I am very uncomfortable working with my manager and being evaluated by her at this point. I am unsure how to navigate working for and with her and would like HR present for some discussions I need to have with her regarding my review and work tasks in general. Please let me know how I should proceed.

(Docket No. 50-4). On its face, this email does not reflect any notice of "pregnancy discrimination" to WEG. To that end, "[t]he Third Circuit has held that general complaints of unfair treatment are insufficient to qualify as protected activity under Title VII." *Locke v. Jefferson Hills Manor*, 460 F. Supp. 3d 613, 620 (W.D. Pa. 2020).[15] Here, there is simply no evidence that she ever expressly complained to WEG that she was being discriminated against because of her

[15] *Cf. Gabriel v. DSM Biomedical, Inc.*, 187 F.4th 77, 83 (3d Cir. 2026) ("Title VII does not ban mere rudeness or protect against abrasive bosses.").

sex or pregnancy.[16] Under these circumstances, Fox's April 2024 email to HR is insufficient to establish that she engaged in "protected activity." *See id.*

Even assuming *arguendo* that Fox expressed "pregnancy discrimination" in this email, "[a]n employee cannot easily establish a causal connection between [her] protected activity and the alleged retaliation when [she] has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014). As the record demonstrates, Parsons' concerns about Fox's performance and their one-on-one meetings regarding same predate Fox's April 2024 email. Although Fox sent this email less than one week before her termination, the reasons for her dismissal were deficiencies that had existed prior to this purportedly protected activity. *See Helfrich v. Lehigh Valley Hosp.*, No. CIV.A. 03-CV-05793, 2005 WL 670299, at *24 (E.D. Pa. Mar. 18, 2005) ("Because LVH has presented credible, unimpeached documentary and testimonial evidence that it was concerned about problems with Mr. Helfrich prior to his alleged protected activity, this Court finds no inference with regard to the temporal proximity of the protected activity and his termination."). Therefore, Fox has failed to raise the inference that her April 2024 email to HR "was the likely reason" for her termination. *Parish*, 373 F. Supp. 3d at 635.

Upon review of the evidence in a light most favorable to Fox and drawing all inferences in her favor, no reasonable factfinder could conclude that she was terminated in retaliation for complaining of sex/pregnancy discrimination. *See Matsushita*, 475 U.S. at 587. Accordingly, summary judgment will be granted on Plaintiff's Title VII and PHRA retaliation claims.

## VI. CONCLUSION

[16] *Cf. Hileman v. W. Penn Allegheny Health Sys. Inc.*, 182 F.4th 283, 288 (3d Cir. 2026) ("Employers' duty to accommodate is real, but it is not a license to speculate. They must respond to what they know—not what they might imagine . . . And they certainly need not go digging for disabilities without a signal that one exists.").

In conclusion, Plaintiff has failed to direct the Court to sufficient record evidence to create a reasonable inference that her termination was the product of unlawful discrimination or retaliation. Because no reasonable trier of fact could find in her favor on this record, summary judgment is appropriate on Counts I, II, and V of Plaintiff's Amended Complaint. Therefore, Defendant's Motion for Summary Judgment [36] is granted in its entirety. Appropriate Orders follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated: September 28, 2026

cc/ecf: All counsel of record